UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

R.F.M. ET AL., on behalf of
themselves and all others
similarly situated,

                    Plaintiffs,

        - against -

KIRSTJEN NIELSEN, in her capacity
as Secretary of the Department of
Homeland Security, ET AL.,

                    Defendants.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/15/19

18-cv-5068 (JGK)

OPINION & ORDER

JOHN G. KOELTL, District Judge:

The plaintiffs, R.F.M., T.D., S.W., D.A.F.A., and O.M.S., are young immigrants who have been determined by the New York State Family Court ("New York Family Court" or "Family Court") to have been abused, abandoned, or neglected by one or both of their parents. Each plaintiff has sought Special Immigrant Juvenile ("SIJ") status -- a form of immigration relief that provides a path to lawful permanent residence in the United States[1] -- and received a denial. The plaintiffs allege that in early 2018 the Department of Homeland Security ("DHS"), the United States Citizenship and Immigration Services ("USCIS"), and individual officers of those agencies[2] (collectively "the

---

[1] See 8 U.S.C. §§ 1101(a)(27)(J); 1255(a), (h).

[2] The defendants are Kirstjen Nielsen, in her capacity as Secretary of DHS; Lee Francis Cissna, in his capacity as Director of the USCIS; Barbara Velarde, in her capacity as Chief of the Administrative Appeals Office of the USCIS; Robert M. Cowan, in his capacity as Director of the USCIS National Benefits Center; Thomas Cioppa, in his capacity as Director of the USCIS New York City District Office;

1

defendants") adopted a new policy without notice, and that prior to this policy change, the plaintiffs' SIJ applications would have been granted. The plaintiffs seek to enjoin the agency's reliance on that policy, arguing that the policy violates the Administrative Procedure Act ("APA") and is based on an erroneous understanding of federal and New York State law. The defendants counter that there is no new policy but merely a centralization of the SIJ adjudication process coupled with a clarification of the SIJ statute and that, in any event, their interpretation of the SIJ statute accords with federal and state law.

The plaintiffs move to certify a class under Federal Rule of Civil Procedure 23(b)(2) and for leave to proceed with this litigation anonymously. The defendants move to dismiss this action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and the parties cross-move for summary judgment under Federal Rule of Civil Procedure 56 on all of their legal claims. The plaintiffs previously moved for a

---

Edward Newman, in his capacity as Director of the USCIS Buffalo District Office; Daniel Renaud, in his capacity as Associate Director of the USCIS Field Operations Directorate; Gwynne Dinolfo, in her capacity as USCIS Albany Field Office Director; Gina Pastore, in her capacity as USCIS Brooklyn Field Office Director; Carmen Whaling, in her capacity as USCIS Buffalo and Syracuse Field Office Director; Elizabeth Miller, in her capacity as USCIS Long Island Field Office Director; William Bierman, in his capacity as USCIS New York Field Office Director; and Brian Meier, in his capacity as USCIS Queens Field Office Director.

preliminary injunction but have withdrawn that motion as moot because the Court is promptly deciding the parties' cross-motions for summary judgment, which are based on the same issues that were briefed in the preliminary injunction motion. See Dkt. Nos. 7, 105.

It is plain that the defendants, contrary to their prior practice, and in contravention of federal law, are now following a policy whereby the New York Family Court cannot issue the necessary findings to juvenile immigrants between the ages of eighteen and twenty-one to enable them to obtain SIJ status. That effectively precludes those immigrants in New York State from obtaining SIJ status despite the fact that the immigration statute otherwise provides that relief. If the immigration laws are to be changed in that way, the change must come from Congress and not from the immigration authorities. Therefore, the plaintiffs' motion for summary judgment should be granted, and the plaintiffs' motion for class certification should also be granted and they should be allowed to proceed anonymously. The defendants' motions should be denied.

I.

In defending against a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiffs bear the burden of proving the Court's jurisdiction by a preponderance of the evidence. Makarova v. United States,

201 F.3d 110, 113 (2d Cir. 2000). In considering such a motion, the Court generally must accept the material factual allegations in the complaint as true. See J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004). However, the Court does not draw all reasonable inferences in the plaintiffs' favor. Id.; Graubart v. Jazz Images, Inc., No. 02cv4645, 2006 WL 1140724, at *2 (S.D.N.Y. Apr. 27, 2006). Indeed, where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists. See APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003); Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998); Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). In doing so, the Court is guided by that body of decisional law that has developed under Federal Rule of Civil Procedure 56. Kamen, 791 F.2d at 1011.

In deciding a motion for summary judgment under Rule 56, courts "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs. L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). However, where "a party seeks review of agency action under the APA, the district judge sits as an appellate

4

tribunal, and the entire case on review is a question of law."
Ass'n of Proprietary Colls. v. Duncan, 107 F. Supp. 3d 332, 344
(S.D.N.Y. 2015) (alteration accepted and quotation marks
omitted). Accordingly, the usual summary judgment standard under
Rule 56 does not apply because the Court need only "address
legal questions" to decide "whether the agency acted
arbitrarily, capriciously or in some other way that violates 5
U.S.C. § 706." Id. Nonetheless, summary judgment is appropriate
in APA cases because the questions on review are purely legal
and are "amenable to summary disposition." Id. (quotation marks
omitted).

Under the APA, courts review issues of law de novo. See 5
U.S.C. § 706 ("[T]he reviewing court shall decide all relevant
questions of law . . . ."). Although courts defer to an agency's
reasonable interpretation of an ambiguous statute that the
agency is charged with administering, see Chevron, U.S.A., Inc.
v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984),
courts must "hold unlawful and set aside agency action[s]" that
are "arbitrary, capricious, an abuse of discretion, or otherwise
not in accordance with law," "in excess of statutory
jurisdiction," or "without observance of procedure required by
law." 5 U.S.C. § 706(2)(A), (C)-(D); Ass'n of Proprietary
Colls., 107 F. Supp. 3d at 344. Deference to the agency is
unwarranted "if the agency has misconceived the law," see SEC v.

Chenery Corp., 318 U.S. 80, 94 (1943), or if "the intent of
Congress is clear, . . . for the court, as well as the agency,
must give effect to the unambiguously expressed intent of
Congress." Chevron, 467 U.S. at 842-43; Cohen v. JP Morgan Chase
& Co., 498 F.3d 111, 116 (2d Cir. 2007).

II.

Because this case centers on the agency's administration of
SIJ status in New York, we begin with an overview of the
relevant statutes and regulations.

A.

Congress created SIJ status under the Immigration and
Nationality Act of 1990 ("INA"). The USCIS is charged with
administering the statute.[3] SIJ status is a form of immigration
relief that provides a path to lawful permanent residence for
young immigrants who have been victims of abuse, neglect, or
abandonment. 8 U.S.C. §§ 1101(a)(27)(J) ("the SIJ statute"),
1255(a), (h); 58 Fed. Reg. 42843, 42844 (Aug. 12, 1993) ("[SIJ
status] alleviates hardships experienced by some dependents of
United States juvenile courts by providing qualified aliens with
the opportunity to apply for special immigrant classification

---

[3] Congress originally charged the Immigration and Naturalization
Service ("INS") with administering the SIJ statute. However, the
Homeland Security Act of 2002 created the DHS, abolished the INS, and
transferred INS functions to the DHS, of which the USCIS is a part.
See Pub. L. No. 107-296, 116 Stat. 2135, 2142, 2177-78, 2195 (2002).
Accordingly, the USCIS is the agency charged with administering the
SIJ statute.

and lawful permanent resident status, with possibility of becoming citizens of the United States in the future.").

Once an immigrant successfully petitions for SIJ classification, the immigrant becomes eligible for a visa under 8 U.S.C. § 1153(b)(4) (allocating a certain percentage of visas annually to "special immigrants," including special immigrant juveniles). To qualify for SIJ status, the immigrant must be a person:

> (i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;
>
> (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and
>
> (iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status . . .

8 U.S.C. § 1101(a)(27)(J). The term "juvenile" as it relates to the SIJ statute includes immigrants up to age twenty-one. 8 C.F.R. § 204.11(c)(1).

After its passage in 1990, the SIJ statute has been amended a number of times, and accordingly, the criteria for SIJ eligibility have changed over time. In 1990, the INA accorded SIJ status to juveniles who had been "declared dependent on a juvenile court," and "deemed eligible by that court for long-term foster care," in cases where the juvenile court also determined "that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence." Immigration Act of 1990, Pub. L. No. 101-649 § 153, 104 Stat. 1978, 5005-06 (1990) (amending 8 U.S.C. § 1101).

In 1993, the Immigration and Naturalization Service ("INS") adopted implementing regulations defining the statutory term "juvenile court" as a "court located in the United States having jurisdiction under state law to make judicial determinations about the custody and care of juveniles." 8 C.F.R. § 101.6(a) (1993). This regulation was adopted when SIJ status was limited to juveniles who were deemed eligible by a juvenile court for long-term foster care. The regulations explained that "long-term foster care means foster care that is of indefinite duration." Id. The regulations deferred to state courts on the meaning of the term "juvenile." Under the 1993 regulations, whether an immigrant qualified as a juvenile depended upon "the law of the

8

state in which the juvenile court upon which the alien has been
declared dependent is located[.]" Id. § 101.6(c)(1).

Congress amended the SIJ statute in 1997, making clear that
the SIJ statute applied to immigrant juveniles who had been
"legally committed to, or placed under the custody of, an agency
or department of a State and who ha[d] been deemed eligible by
that [juvenile] court for long-term foster care due to abuse,
neglect, or abandonment." Pub. L. No. 105-119 § 113, 111 Stat.
2440, 2460 (1997) (amending 8 U.S.C. § 1101); J.L. v. Cissna,
341 F. Supp. 3d 1048, 1055 (N.D. Cal. 2018). Congress also added
a requirement that the Attorney General "expressly consent[] to
the dependency order serving as a pre-condition to the grant of
special immigrant juvenile status." § 113, 111 Stat. at 2460-
61. Without such consent, SIJ status could not be granted. J.L.,
341 F. Supp. at 1055.

After the 1997 amendment, INS regulations continued to
define "juvenile court" as a "court located in the United States
having jurisdiction under State law to make judicial
determinations about the custody and care of juveniles." 8
C.F.R. § 204.11(a) (1999). The agency defined juvenile to
include aliens under twenty-one years of age. Id.
§ 204.11(c)(1). The agency continued to require that the alien
has been "deemed eligible by the juvenile court for long-term
foster care." Id. § 204.11(c)(4). Whether a juvenile was

9

"dependent upon a juvenile court" remained a question of state law on which the agency deferred to the state courts. Id. § 204.11(c)(3). However, the INS added to its regulations a definition of the statutory phrase "eligible for long-term foster care," that defined the phrase to mean "a determination has been made by the juvenile court that family reunification is no longer a viable option." Id. § 204.11(a). Accordingly, to be eligible for SIJ status, an SIJ petitioner was required to obtain that specific finding from a juvenile court.

The SIJ statute was amended in 2008 by the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"). The TVPRA struck the requirement that the juvenile must be eligible for long-term foster care, broadening the statute to apply instead to juveniles for whom "reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law." Pub. L. 110-457 § 235(d)(1)(B), 122 Stat. 5044 (2008) (amending 8 U.S.C. § 1101(a)(27)(J)). The TVPRA also expanded SIJ status to be available to juveniles who have been "declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court . . . ." 8 U.S.C. § 1101(a)(27)(J)(i) (emphasis added). The

10

TVPRA amended the "consent" requirement giving the Secretary of DHS, rather than the Attorney General, authority to consent to the grant of SIJ classification, and removing the requirement that the consent be express. § 235(d)(1)(B), 122 Stat. at 5079 (2008).

Despite the 2008 amendments striking any reference to foster care, the agency failed to amend its regulations requiring that the juvenile be deemed eligible for long-term foster care. See 8 C.F.R. § 204.11(c)(4). Moreover, other parts of the regulations are tied to the prerequisite of eligibility for foster care. Eligibility for foster care is the basis for the requirement that "a determination has been made by the juvenile court that family reunification is no longer a viable option." Id. § 204.11(a). And a juvenile court is defined as a court "having jurisdiction under State law to make judicial determinations about the custody and care of juveniles." Id. Accordingly, even though Congress struck the foster care requirements from the SIJ statute in 2008, the current agency regulations continue to rely on foster care determinations and requirements.

**B.**

The following facts relating to the individual plaintiffs are taken from the administrative record or the plaintiffs' sworn declarations and are not disputed by the defendants.

11

The plaintiffs are young immigrants who, between their eighteenth and twenty-first birthdays, were determined by the New York Family Court to have been abused, neglected, or abandoned by one or both parents. Each plaintiff obtained a Special Findings Order -- that is, a state court order making the requisite findings for SIJ status -- from a New York Family Court, stating that (1) the plaintiff had been abused, neglected, or abandoned; (2) the plaintiff was dependent on the Family Court; (3) reunification with one or both of their parents was not viable; and (4) return to the plaintiff's previous country of nationality or of last habitual residence would not be in his or her best interest. Each plaintiff petitioned the federal government for SIJ status on the basis of their Family Court Special Findings Orders.

Plaintiff R.F.M. was born in the Dominican Republic. Malionek Decl. Ex. 1 ¶ 3. R.F.M.'s mother has had limited involvement in her life, and R.F.M.'s father has had none. Id. ¶¶ 5, 15. R.F.M.'s mother sent her to the United States to live with her grandmother when she was eight months old. Id. ¶ 4. R.F.M. has remained in the United States since she was an infant, and she has no memory of the Dominican Republic. Id. ¶¶ 4, 10. Because her parents have not provided her any support, R.F.M. considers her grandmother to be her mother. Id. ¶ 11. The limited interactions between R.F.M. and her mother have been

hurtful to R.F.M. At one point, R.F.M.'s mother expressed that she thought it was good that R.F.M. is a victim of sexual assault. Id. ¶ 17. R.F.M.'s mother's treatment of R.F.M. was so distressing that R.F.M. was hospitalized. Id.

On February 15, 2017, the Family Court in The Bronx, New York, appointed R.F.M.'s grandmother to be her guardian. Id. ¶¶ 6, 22. The Family Court also issued a Special Findings Order stating that R.F.M. was dependent on the Family Court, that reunification with her parents was not viable, and that it would not be in R.F.M.'s best interest to return to the Dominican Republic. Id. App. B.

Plaintiff T.D. was born in Haiti in 1997. Malionek Decl. Ex. 2 ¶ 2. She was raised in her father's home by aunts and uncles, who disciplined T.D. by beating her with belts, branches, and their hands, causing her to bleed. Id. ¶¶ 2, 11–12. T.D. has no memory of ever living with her mother, and her mother died suddenly in June 2015. Id. ¶¶ 2–3.

When T.D. was fourteen years old, her father sent her to live with his sister in Brooklyn, New York. Id. ¶ 4. T.D. feels that her father was trying to get rid of her. Id. ¶ 15. After sending T.D. away, T.D.'s father disappeared from her life. Id. ¶¶ 4, 16. T.D. states that her aunt in Brooklyn has treated T.D. cruelly, and T.D. has considered taking her own life. Id. ¶¶ 17–20.

T.D. has found support in her high school assistant
principal, I.L. Id. ¶ 21. I.L. makes T.D. feel protected and has
been a reliable figure in T.D.'s life. Id. ¶ 22. On October 18,
2016, a Family Court in Brooklyn, New York, appointed I.L. to be
T.D.'s guardian. Id. ¶ 6. The Family Court found that T.D. was
dependent on the Family Court, that reunification with her
parents is not viable, and that returning to Haiti would not be
in her best interest. Id. App. B.

Plaintiff S.W. was born in Jamaica in 1998. Malionek Decl.
Ex. 3 ¶¶ 2-3. S.W.'s mother left Jamaica when S.W. was about
five years old, leaving S.W. and her sister to live with their
grandmother, who became their primary caretaker. Id. ¶ 9. S.W.'s
mother did not call S.W. or her sister, nor did she help them
financially. Id. S.W. saw her father only a couple of times a
year. Id. ¶ 10.

S.W. travelled to Florida to visit her aunt in 2005. Id.
¶ 12. While in Florida, S.W. received news that her grandmother
had been shot and killed while sitting next to S.W.'s little
sister on a bus in Jamaica. Id. ¶¶ 12-13. S.W. stayed with her
aunt because Jamaica was not safe. Id. ¶ 13.

One or two years after moving in with her aunt in Florida,
S.W.'s aunt told S.W. that S.W. had to move to The Bronx to stay
with her Uncle O. Id. ¶ 15. One or two years later, S.W.'s Uncle
O told S.W. that she had to move to Albany to live with another

aunt. Id. ¶ 17. S.W. continued to be moved from relative to relative and state to state. Id. ¶¶ 20-21.

On October 16, 2016, a New York Family Court appointed S.W.'s Uncle O to be her guardian. Id. ¶ 22. The Family Court also issued a Special Findings Order stating that S.W. is dependent on the Family Court, that reunification with her parents is not viable, and that it is not in her best interest to return to Jamaica. Id. App. B.

Plaintiff D.A.F.A. was born in 1998 in El Salvador. Malionek Decl. Ex. 4 ¶ 2. D.A.F.A.'s father has never been a part of his life. Id. ¶¶ 4, 14. D.A.F.A. lived with his mother until he was five, at which time his mother left for the United States in order to work and provide money to support her children. Id. ¶¶ 3, 19. When D.A.F.A.'s mother left for the United States, D.A.F.A. moved in with his grandmother. Id. ¶¶ 5, 21.

When D.A.F.A. was a teenager, local gangs attempted to recruit him. First, members of the "18" gang began to approach D.A.F.A. after school. Id. ¶ 23. These recruitment efforts terrified D.A.F.A. because D.A.F.A. knew that the gang members were dangerous. Id. D.A.F.A. feared that the gang members would retaliate against him or his family when he told the gang members to leave him alone. Id. When D.A.F.A. told his mother about the gang's recruitment efforts, she helped him transfer to

15

a different school. Id. ¶ 24. Although this move provided relief from the 18 gang's recruitment efforts, at the new school, members of the MS-13 gang sought to recruit D.A.F.A. Id. ¶ 25. D.A.F.A. stopped attending school because he was afraid that he would not be able to escape gang recruitment efforts. Id. ¶ 26. However, because there were gang members in his neighborhood, D.A.F.A. also did not feel safe remaining home. Id.

In April 2015, D.A.F.A. left El Salvador seeking safety in the United States. Id. ¶¶ 6, 27. He crossed the United States border in November 2015 and was apprehended by immigration officials. Id. ¶¶ 6, 28. D.A.F.A. was eventually released to his mother, who lives in Central Islip, New York. Id. ¶¶ 7, 28. D.A.F.A. has lived with his mother ever since. Id. ¶ 30.

On February 21, 2017, a New York Family Court appointed D.A.F.A.'s mother as his guardian. Id. ¶¶ 9, 32. The Family Court issued a Special Findings Order stating that D.A.F.A. is dependent on the Family Court, that reunification with his father is not viable, and that it would not be in D.A.F.A.'s best interest to be removed to El Salvador. Id. App. B.

Plaintiff O.M.S. was born in Mexico in 1997. Malionek Decl. Ex. 16 ¶ 2. O.M.S. lived with her grandmother when she was very young, and her grandmother has since passed away. Id. ¶ 3. O.M.S. believes that she was brought to the United States when she was around four years old. Id. ¶¶ 4, 11.

16

For most of her life, O.M.S. has lived with her mother. Id. ¶ 5. Her father lived with them when O.M.S. was very young, but he drank a substantial amount and was violent towards O.M.S. and her mother. Id. ¶¶ 6, 12-15, 17-18. In about 2003, O.M.S.'s father threatened her mother, and her mother called the police. Id. ¶ 19. O.M.S.'s father left the family after this incident. Id.

A New York Family Court granted custody to O.M.S.'s mother on March 26, 2007. Id. ¶ 24. The Family Court granted visitation to O.M.S.'s father, but he eventually stopped visiting her. Id. ¶¶ 6, 25. On December 6, 2016, O.M.S.'s mother became her legal guardian. Id. ¶ 7. The Family Court issued a Special Findings Order stating that O.M.S. is dependent on the Family Court, that reunification with her father is not viable, and that it would not be in her best interest to return to Mexico. Id. App. B.

Each of the plaintiffs applied for SIJ status on the basis of their Special Findings Orders. The USCIS sent each plaintiff at least one, and sometimes multiple, requests for evidence to show that the Family Court was acting as a "juvenile court" at the time that it issued the Special Findings Orders. Eventually, each plaintiff's SIJ application was denied.

The agency stated that the plaintiffs' SIJ petitions were denied because the Family Court was not acting as a juvenile court when it issued the plaintiffs' Special Findings Orders.

17

The agency gave two bases for this conclusion: first, the Family Court allegedly lacks jurisdiction as a "juvenile court" over immigrants between their eighteenth and twenty-first birthdays because it cannot make custody determinations for those individuals; and second, the Family Court must have the power to order reunification with the allegedly abusive parent in order to be able to make the requisite finding that "reunification with 1 or both of the immigrant's parents is not viable." See 8 U.S.C. § 1101(a)(27)(J)(i).

The plaintiffs assert that these bases for their denials constitute a new policy that violates the APA because it is arbitrary and capricious, "in excess of statutory jurisdiction," and "without observance of procedure required by law." See 5 U.S.C. § 706(2)(A), (C)-(D). Under this policy, The USCIS has determined that the New York Family Court is not a "juvenile court" when it exercises jurisdiction over immigrants who are eighteen to twenty-one years old. Administrative Record ("AR") 24-29, 143-48, 412-17, 514-19, 838. Although the defendants argue that there is no new policy, both parties agree that prior to taking its new position regarding the New York Family Court, the USCIS regularly approved SIJ petitions made by juveniles who were between eighteen and twenty-one years of age when the

Family Court issued a Special Findings Order, but that in early 2018 the agency began denying virtually[4] all of these petitions.

## C.

The New York Family Court is recognized as a "special agency for the care and protection of the young and the preservation of the family." Jesmer v. Dundon, 271 N.E.2d 905, 907 (N.Y. 1971). The Family Court has jurisdiction over all proceedings involving abuse, neglect, support, guardianship, and custody, N.Y. Fam. Ct. Act § 115(a)(i)-(ii), (iv); accord N.Y. Const. Art. VI § 13, and is the court in New York that makes the predicate findings for SIJ status.[5]

Although the Family Court typically only has jurisdiction over juveniles up to the age of eighteen, see N.Y. Fam. Ct. Act § 119(c), the Family Court has jurisdiction to appoint a guardian over a juvenile between the ages of eighteen and

---

[4] The plaintiffs submitted data, which the defendants do not dispute, showing that prior to 2018 the agency approved hundreds of SIJ applications by petitioners who were over the age of eighteen when they received a Special Findings Order from the New York Family Court. Since 2018, the agency has denied virtually all of these petitions. See Stotland Decl. ¶¶ 9-13.

[5] At oral argument, both parties agreed that the court in New York that issues Special Findings Orders for SIJ status is the Family Court. See Transcript of the February 25, 2019, argument on the motions ("Tr.") at 8-12, 55. The parties also agreed that the New York Surrogate's Court would also be empowered to issue Special Findings Orders, but that as a matter of practice, Special Findings Orders are issued by the Family Court. The government stated that its new interpretation of the SIJ statute would also apply to the Surrogate's Court. Id. at 55. Issues surrounding the Surrogate's Court have not been briefed, and in any event, the class is defined only to include juveniles who obtained Special Findings Orders from the Family Court. Id. at 11.

twenty-one with the juvenile's consent, and in such cases, that juvenile is considered an "infant or minor." N.Y. Fam. Ct. Act. § 661(a); Matter of Trudy-Ann W. v. Joan W., 901 N.Y.S.2d 296, 298 (App. Div. 2010).

New York courts hold, and the USCIS agrees, that appointment of a guardian makes the juvenile "dependent" on the Family Court for purposes of the SIJ statute. See, e.g., Matter of Trudy-Ann W., 901 N.Y.S.2d at 299; Matter of Antowa McD., 856 N.Y.S.2d 576, 577 (App. Div. 2008); Dkt. No. 77 at 16 n.6 ("USCIS agrees that under New York Law, a guardianship order issued by the Family Court is a dependency order").

Until early 2018, the USCIS regularly approved SIJ applications made by immigrants who obtained Special Findings Orders from the New York Family Court after turning eighteen years old, but before turning twenty-one. However, in early 2018, the USCIS began denying almost all SIJ applications from petitioners who obtained Special Findings Orders from the New York Family Court after turning eighteen. The plaintiffs contend that the bases for these SIJ denials constitute an arbitrary and capricious policy that is contrary to both state and federal law. They further contend that the policy was enacted without adherence to required procedures under the APA. The plaintiffs seek to enjoin the agency from adjudicating SIJ petitions in accordance with that policy.

20

### III.

The plaintiffs have moved for class certification under Federal Rule of Civil Procedure 23(b)(2). The proposed class would include all immigrants who obtained Special Findings Orders from the New York Family Court between their eighteenth and twenty-first birthdays, applied for SIJ status, and either:

> (1) [were] issued (i) Notices of Intent to Deny, (ii) Notices of Intent to Revoke, (iii) Decisions of Denial, or (iv) Decisions revoking previously-granted SIJ status since January 1, 2016 on the ground that the Family Court is not a "juvenile court" under 8 C.F.R. § 204.11(a) and/or that the Family Court is not empowered to issue Special Findings Orders under 8 U.S.C. § 1101(a)(27)(J); or
>
> (2) have a Special Findings Order finding the eligibility criteria of 8 U.S.C. § 1101(a)(27)(J) are satisfied and have a pending petition for SIJ status before the USCIS based on the Special Findings Order.

See Dkt. No. 9 (defined terms omitted).

Under Rule 23, a class may be certified only if the proposed class satisfies the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a)(1)-(4); Marisol A. v. Giuliani, 126 F.3d 372, 375 (2d Cir. 1997). To satisfy numerosity "the class must be so numerous that joinder of all members is impracticable." Brown v. Kelly, 609 F.3d 467, 475 (2d Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)). Commonality requires that there be "a common question of law or fact shared by the class." Id. Typicality is met if

"the claims or defenses of the class representatives [are] typical of the claims or defenses of the class members." Id. Adequacy is met when "the representative parties will fairly and adequately protect the interests of the class." Id.

In addition to these four prerequisites, a class may be certified only if it is deemed appropriate under one of the subdivisions of Rule 23(b). Id. at 476. The plaintiffs argue that the proposed class is appropriate under Rule 23(b)(2), which allows for certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

The plaintiffs bear the burden of establishing the Rule 23 class certification requirements by a preponderance of the evidence. Brown, 609 F.3d at 476. Rule 23 is to be construed liberally, and courts reviewing a motion under Rule 23 "are to adopt a standard of flexibility." See Marisol A., 126 F.3d at 377. For the reasons below, the plaintiffs' motion for class certification is **granted**.

### A.

First, the numerosity requirement is met. The proposed class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The plaintiffs

reasonably estimate[6] that the proposed class includes hundreds of individuals who have received Notices of Intent to Deny, Notices of Intent to Revoke, Decisions of Denial, or Decisions revoking previous grants of SIJ status based on the alleged agency policy at issue. The government does not contest the plaintiffs' estimate of the class size. Courts generally find that classes consisting of at least forty members satisfy numerosity. See, e.g., Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995) (noting that "numerosity is presumed at a level of 40 members").

Numerosity is also satisfied because joinder would be impracticable. New members regularly and continuously join the proposed class as their SIJ status petitions are adjudicated. Cf. Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993) (instructing that courts should consider whether the lawsuit involves "requests for prospective injunctive relief which would involve future class members"). Moreover, because members of the proposed class lack financial resources, and often the legal representation to bring lawsuits individually, it is not

---

[6] To show numerosity, it is sufficient for the plaintiffs to "reasonably estimate the number of class members" and they "need not show the exact number." Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993) (quotation marks omitted). The exact number of proposed class members is unknown. The plaintiffs base their estimate on data collected from The Door, KIND, and the Legal Aid Society, which are non-profit organizations that provide free legal services to immigrant youth.

"economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits." Deposit Guaranty Nat'l Bank v. Roper, 445 U.S. 326, 339 (1980). Accordingly, the numerosity requirement is satisfied.

The defendants argue that commonality is not satisfied because review of an SIJ status determination requires analysis of each individual state court order. The defendants' argument misses the mark. The plaintiffs are not challenging individual SIJ status decisions, nor do the plaintiffs ask this Court to determine the outcome of any individual petition. Rather, the plaintiffs challenge an alleged agency policy affecting the outcomes of their SIJ adjudications as violating the APA. See Perez-Olano v. Gonzalez, 248 F.R.D. 248, 259 (C.D. Cal. 2008) (holding that claims challenging a "common set of policies and practices" regarding SIJ eligibility satisfy commonality because they "will not turn on individualized adjudications"). Common questions of law -- whether the agency is following a new policy and whether that policy violates the APA -- will be significant in the adjudication of the individual cases of the class members, but this action does not seek to determine the actual results in those individual cases. Accordingly, resolution on a class-wide basis will allow for an important issue in the individual cases to be decided in "one stroke." See Wal-Mart

24

Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011); Sykes v. Mel S. Harris and Assocs. LLC, 780 F.3d 70, 80 (2d Cir. 2015).

The defendants also argue that commonality is not satisfied because Wal-Mart Stores requires that the plaintiffs suffer a common injury. However, the Supreme Court in Wal-Mart Stores emphasized that the Wal-Mart plaintiffs could not point to a corporate policy that predominated in the claims of the putative class; rather, they sought to sue over "literally millions of employment decisions at once." 564 U.S. at 352. The plaintiffs in this case are suing over a single alleged policy, and that policy is "the glue holding" the plaintiffs' claims together that the Supreme Court requires for class certification. See id. The plaintiffs' claims are based, as Wal-Mart Stores requires, on a "common contention," that is "of such a nature that it is capable of classwide resolution." Id. at 350.

Next, the defendants argue that typicality is not satisfied because the class includes plaintiffs in various stages of the SIJ adjudication process. The named plaintiffs belong to the subcategory of the class involving those who have been issued decisions denying SIJ status, but the class also includes individuals whose SIJ petitions are still pending and individuals whose SIJ status was revoked after January 1, 2016. The defendants contend that typicality is not satisfied because (1) the plaintiffs whose petitions are still pending do not have

25

ripe claims and (2) the Court lacks jurisdiction under 8 U.S.C.
§ 1252(a)(2)(B)(ii) to review claims by the plaintiffs who have
received SIJ status revocations.[7]

The defendants' argument again incorrectly assumes that the
plaintiffs seek review of their individual claims. The
plaintiffs do not seek to litigate individual claims but rather
a policy the agency uses to adjudicate those claims. The policy
challenged by the plaintiffs poses the same "risk of an injury"
to all members of the class, even those who have not yet
received a final decision on their SIJ petition. See Baby Neal
for and by Kanter v. Casey, 43 F.3d 48, 63 (3d Cir. 1994). The
fact that the proposed class includes members at various stages
of administrative review does not defeat class certification.
Courts regularly approve classes involving future members when
those members face a threat of imminent injury. See, e.g., Abdi
v. Duke, 323 F.R.D. 131, 137-38 (W.D.N.Y. 2017) ("In general,
the fact that future members are included in a proposed class
does not pose an obstacle to certification."); Butler v. Suffolk

---

[7] 8 U.S.C. § 1252(a)(2)(B)(ii) is a provision that strips courts of
jurisdiction to review certain discretionary decisions of the Attorney
General or the Secretary of Homeland Security. As discussed in greater
detail below, the provision does not bar review of a plaintiff's
challenge of an agency policy under the APA. The defendants' argument
that 8 U.S.C. § 1252(a)(2)(B)(ii) bars jurisdiction is predicated on
the assumption that the plaintiffs seek review of individual SIJ
status revocations. However, the plaintiffs do not ask this Court to
review individual revocations but rather the policy on which those
revocations were based.

Cty., 289 F.R.D. 80, 99 (E.D.N.Y. 2013). Each plaintiff "makes similar legal arguments to prove the defendant's liability," In re Drexel Burnham Lambert Grp., 960 F.2d 285, 291 (2d Cir. 1992), and therefore typicality is satisfied.

The adequacy requirement is also satisfied. The plaintiffs' counsel is qualified and experienced to conduct this litigation.[8] See id. Moreover, the named plaintiffs are highly motivated to pursue this action vigorously. See Malionek Decl. Ex. 1 ¶ 27 (statement by R.F.M. that "I am terrified of being returned to the Dominican Republic, a place I don't even know, and a place where I fear for my safety because of all of the violence there"); id. Ex. 2 ¶¶ 34-35 (statement by T.D. that "I am scared of being returned to Haiti, where I can't study or have a job," and "if I had to return to Haiti, I would not be able to be with my sister, whom I love very much"); id. Ex. 3 ¶ 31 (statement by S.W. that "If I had to go back to Jamaica, all my plans for myself would go down the drain. I don't know where I could stay. I don't know where my father is because I have not heard from him at all in about two years"); id. Ex. 4 ¶ 38 (statement by D.A.F.A. that "I am terrified of being returned to El Salvador, where gang members will likely hurt or kill me for refusing to join their gangs, and I am afraid of being separated from my

---

[8] The plaintiffs are represented by attorneys from The Legal Aid Society of New York and Latham & Watkins LLP.

mother and stepfather again"); id. Ex. 16 ¶ 42 (statement by
O.M.S. that "If I had to go back to Mexico, I wouldn't be able
to go to school and it would be hard to work because I struggle
to speak Spanish. . . . It would be extremely difficult for me
to live in Mexico because almost all my family lives in the
United States"). There are no conflicts of interest between the
named plaintiffs and the proposed class members, and all of the
members of the proposed class share an interest in enjoining the
alleged change in policy.

Finally, the plaintiffs have satisfied Rule 23(b)(2)
because they seek "final injunctive relief" that will resolve a
central issue in the claims by the "class as a whole." See Fed.
R. Civ. P. 23(b)(2). Whether the New York Family Court is a
juvenile court for purposes of rendering sufficient findings for
an SIJ determination is a determinative factor for all members
of the class. "The key to the (b)(2) class is 'the indivisible
nature of the injunctive or declaratory remedy warranted -- the
notion that the conduct is such that it can be enjoined or
declared unlawful only as to all of the class members or as to
none of them.'" Wal-Mart Stores, 564 U.S. at 360 (quoting
Richard A. Nagareda, Class Certification in the Age of Aggregate
Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)). Because the plaintiffs
uniformly seek to enjoin an agency policy precluding the New
York Family Court from qualifying as a "juvenile court" for

28

purposes of issuing SIJ findings for immigrants between the ages of eighteen and twenty-one, Rule 23(b)(2) is satisfied.

Because the requirements of Rule 23(a) and 23(b)(2) are satisfied, the plaintiff's motion for class certification is **granted**.

## IV.

The plaintiffs also move to proceed anonymously by using only their initials to identify themselves in this litigation.

Federal Rule of Civil Procedure 10(a) states the general proposition that a complaint must identify the names of the parties. See Fed. R. Civ. P. 10(a). "This requirement, though seemingly pedestrian, serves the vital purpose of facilitating public scrutiny of judicial proceedings and therefore cannot be set aside lightly." Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 188-89 (2d Cir. 2008). When determining whether to grant a motion to proceed anonymously, courts must balance the plaintiffs' interest in anonymity against the public's interest in disclosure and any prejudice anonymity may pose to the defendants. Id. at 189. The Court of Appeals for the Second Circuit has provided the following non-exhaustive list of factors for courts to consider in deciding a motion to proceed anonymously:

> (1) whether the litigation involves matters that are highly sensitive and of a personal nature;

29

(2) whether identification poses a risk of retaliatory physical or mental harm to the . . . party seeking to proceed anonymously or even more critically, to innocent non-parties;

(3) whether identification presents other harms and the likely severity of those harms, including whether the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity;

(4) whether the plaintiff is particularly vulnerable to the possible harms of disclosure, particularly in light of his age;

(5) whether the suit is challenging the actions of the government or that of private parties;

(6) whether the defendant is prejudiced by allowing the plaintiff to press his claims anonymously, whether the nature of that prejudice (if any) differs at any particular stage of the litigation, and whether any prejudice can be mitigated by the district court;

(7) whether the plaintiff's identity has thus far been kept confidential;

(8) whether the public's interest in the litigation is furthered by requiring the plaintiff to disclose his identity;

(9) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigants' identities; and

(10) whether there are any alternative mechanisms for protecting the confidentiality of the plaintiff.

Id. at 190 (quotation marks and citations omitted; alterations accepted). These factors weigh in favor of the plaintiffs' motion to proceed using initials.

First, this action involves "matters that are highly sensitive and of a personal nature." Id. at 190 (quotation marks omitted). The plaintiffs have all been the victims of abuse, neglect, or abandonment, and a Family Court has determined that reunification with at least one of their parents is not viable. The facts supporting these findings of abuse, neglect, and abandonment are highly sensitive. Indeed, the related records from the New York Family Courts are protected by law from indiscriminate public inspection, N.Y. Fam. Ct. Act § 166, and immigration matters are treated with sensitivity under the Federal Rules of Civil Procedure and the INA. See Fed. R. Civ. P. 5.2(c) (setting forth limitations on public access to immigration records); cf. 8 U.S.C. § 1357(h) (stating that immigrants described in the SIJ statute should not be forced to contact their alleged abusers during any stage of the SIJ application process). Moreover, the plaintiffs' vulnerability is evidenced by the fact that they have been declared dependent on the New York Family Court. Accordingly, the first Sealed Plaintiff factor weighs in favor of allowing the plaintiffs to proceed using initials.

The parties disagree over the second factor -- whether identification poses a risk of retaliatory physical or mental harm to the plaintiffs. The plaintiffs fear that disclosure could lead to retaliation from local police or federal immigration authorities and members of the public such as employers, school personnel, and family members. The defendants argue that the alleged risk of retaliation is speculative and does not warrant proceeding anonymously.

The plaintiffs' fear of retaliation by the government is unfounded, given that the plaintiffs have already disclosed their identities to the defendants for purposes of this litigation so that the government could retrieve the relevant administrative records. The question whether the plaintiffs' fear of retaliation from members of the public is a legitimate fear "is a close one," see Plaintiffs # 1-21 v. Cty. of Suffolk, 136 F. Supp. 3d 264, 271-72 (E.D.N.Y. 2015), that need not be decided on this motion because the remaining factors weigh sufficiently in the plaintiffs' favor to allow them to proceed anonymously.

The parties do not present any arguments on the third factor and it is therefore neutral. The fourth factor -- whether the plaintiffs are vulnerable to harm from disclosure -- weighs in the plaintiffs' favor. The facts underlying the plaintiffs' SIJ petitions involve "matters of a highly sensitive and

personal nature." Moe v. Dinkins, 533 F. Supp. 623, 627 (S.D.N.Y. 1981), aff'd, 669 F.2d 67 (2d Cir. 1982). The plaintiffs are young, and disclosure of their immigration status may adversely affect their prospects for gainful employment. Their youth and inexperience would make it much more difficult for the plaintiffs to overcome these challenges.

The fifth factor also weighs in the plaintiffs' favor. The plaintiffs bring this action against the federal government. "[W]here a plaintiff attacks governmental activity, for example a governmental policy or statute, the plaintiff's interest in proceeding anonymously is considered particularly strong." EW v. N.Y. Blood Ctr., 213 F.R.D. 108, 111 (E.D.N.Y. 2003). In cases brought against government entities, "personal anonymity is more readily granted." Id. at 112. This is because "the plaintiff presumably represents a minority interest (and may be subject to stigmatization), and there is arguably a public interest in a vindication of [the plaintiff's] rights." Id. at 111. Moreover, the personal characteristics of the individual litigants (such as credibility) are generally not at issue. Id.

The sixth factor, risk of prejudice to the defendants, favors anonymity. Any risk of prejudice to the defendants is slight. The defendants' ability to defend this action will not be impaired by the plaintiffs' anonymity because the plaintiffs

have already identified themselves to the government for
purposes of this litigation. See Dkt. No. 40.

The seventh factor -- whether the plaintiffs have retained
their anonymity thus far -- favors the plaintiffs. In this case,
the plaintiffs have retained their anonymity, which weighs in
favor of allowing the plaintiffs to continue proceeding
anonymously.

The eighth and ninth factors ask the Court to weigh the
public's interest in disclosure. Here, there is a weak public
interest in knowing the plaintiffs' identities because this case
is based purely on questions of law. The particular identities
of the plaintiffs have "little bearing on the nature of the
dispute or the merits of the case," and the issue of the
plaintiffs' identities is "largely irrelevant to the public
concern with the nature of the process." Doe v. Del Rio, 241
F.R.D. 154, 158 (S.D.N.Y. 2006).

The parties dispute the tenth factor -- whether there are
alternative mechanisms for protecting the identities of the
plaintiffs. One such measure has already been taken: the
plaintiffs have disclosed their identities to the defendants so
that the government could retrieve all of the relevant
administrative records. The defendants suggest that rather than
allowing the plaintiffs to proceed anonymously, the Court should
allow certain documents in this case to be filed in redacted

34

form or under seal. However, there is no reason to think that
redacted documents would further the public's interest in
disclosure any more than documents identifying the plaintiffs by
their initials and, as previously discussed, risk of prejudice
to the defendants has been mitigated because the plaintiffs have
disclosed their identities to the defendants.

Having weighed and considered all the relevant factors, the
balance of considerations tilts decidedly in favor of allowing
the plaintiffs to proceed anonymously. Accordingly, the
plaintiffs' motion to proceed anonymously is **granted**.

**V.**

The defendants argue that the Court lacks jurisdiction to
review the claims of two portions of the class: (1) those who
have received decisions from the USCIS revoking a previous grant
of SIJ classification and (2) those whose SIJ petitions are
still pending. The defendants argue that 8 U.S.C.
§ 1252(a)(2)(B)(ii) bars this Court's review of claims involving
class plaintiffs who have received revocations, and the
defendants move to dismiss their claims under Federal Rule of
Civil Procedure 12(b)(1). The defendants argue that the
plaintiffs whose SIJ petitions are still pending have not
received a final agency action, and that their claims are
therefore not ripe for review under the APA.

35

**A.**

The INA strips courts of jurisdiction to review any "decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii). According to the defendants, the agency's decision to revoke SIJ status, as allowed by 8 U.S.C. § 1155, is a matter within its discretion. See 8 U.S.C. §§ 1154-1155.

8 U.S.C. § 1155 provides that the "Secretary of Homeland Security may, at any time, for what he deems to be good and sufficient cause, revoke the approval of any petition approved by him under section 1154 of this title." Section 1154 of Title 8 is the provision that allocates visas for special immigrants, including those classified as an SIJ. See 8 U.S.C. § 1154(a)(1)(G). Accordingly, the government argues that the decision to revoke an SIJ classification is within the agency's discretion and is unreviewable under § 1252(a)(2)(B)(ii).

The government cites several cases to support its argument that the INA bars this Court from reviewing decisions made under § 1155 to revoke a visa petition. See, e.g., Bultasa Buddhist Temple of Chicago v. Nielsen, 878 F.3d 570, 573-74 (7th Cir. 2017); Bernardo ex rel. M & K Eng'g, Inc. v. Johnson, 814 F.3d 481, 482 (1st Cir. 2016) (collecting cases); Sands v. U.S. Dep't

36

of Homeland Sec., 308 F. App'x 418, 419-20 (11th Cir. 2009) (per curiam). But see ANA Int'l, Inc. v. Way, 393 F.3d 886, 889 (9th Cir. 2004).

These cases are not on point because the plaintiffs did not seek judicial review of an agency policy, but rather, sought review of their individual visa revocations or the failure to issue visas in individualized cases.[9] The plaintiffs in this case do not seek review of such individual decisions. Rather, they contest the agency policy on which the revocation decisions rest. They seek to prevent the agency from denying SIJ status to juveniles based on a policy that prevents the New York Family Court from being considered a juvenile court for purposes of issuing findings for SIJ status. And there is no assertion by the defendants that the agency policy was promulgated pursuant to § 1155 or any other of the statutory provisions to which § 1252's jurisdictional bar applies. And while the defendants point out that § 1252(a)(2)(B)(ii) bars review of discretionary decisions made under § 1155, the plaintiffs challenge this policy as falling outside the bounds of the agency's discretion. Indeed, one of the cases the government cites states that even though "§ 1252(a)(2)(B) otherwise bars review of a discretionary

---

[9] Moreover, none of these cases involve SIJ status. However, it is unnecessary to decide whether the holdings apply to SIJ revocations for purposes of this motion.

act, [courts] have jurisdiction to review a predicate legal
question that amounts to a nondiscretionary determination
underlying the denial of relief." Abdelwahab v. Frazier, 578
F.3d 817, 821 (8th Cir. 2009) (quotation marks omitted).
Accordingly, the defendants' motion to dismiss for lack of
subject matter jurisdiction is **denied**.

**B.**

The defendants also argue that the Court lacks jurisdiction
to consider claims by class members whose SIJ petitions are
still pending because there has been no final, reviewable agency
action under the APA. See 5 U.S.C. § 704.

**1.**

The defendants base their argument on the assertion that
there is no new policy. According to the defendants, because
there is no new policy, and because this portion of the
plaintiff class has not received a final decision on their SIJ
petitions, there is no reviewable agency action under § 704 of
the APA. The plaintiffs argue that there has been a fundamental
policy change. Specifically, the plaintiffs contend that for
several years the USCIS has routinely granted SIJ status to
petitioners in New York between the ages of eighteen and twenty-
one who received the necessary findings from the New York Family
Court, Am. Compl. ¶ 6, but that because of a recent change in
policy, the USCIS has consistently denied SIJ status to

38

virtually all petitioners in New York between those ages on the
ground that the Family Court is not a "juvenile court."

The USCIS does not dispute that until early 2018, it
regularly approved SIJ applications by petitioners who were
older than eighteen when they received a Special Findings Order
from a New York Family Court, and that after early 2018 it began
denying virtually all such petitions on the grounds that the
Family Court was not acting as a "juvenile court." The USCIS
attributes its sudden departure from its past practice to a
November 2016 decision to centralize the adjudication of SIJ
petitions. Before November 2016, SIJ decisions were made by
individual field offices. In November 2016, the USCIS
centralized its processing of SIJ petitions at its National
Benefits Center in Missouri. AR 621, 650, 655.

As part of this centralization, the USCIS provided training
to its National Benefits Center adjudicators and updated the
USCIS Policy Manual. In February 2018, the USCIS issued a Legal
Guidance in response to a request from the National Benefits
Center for legal clarification regarding applications filed by
petitioners over the age of eighteen at the time the state court
order was issued. See id. at 724-25.

The February 2018 Legal Guidance stated that for a state
court order to be considered a "valid juvenile court order for
purposes of establishing SIJ eligibility, the court that issued

39

the order must have had competent jurisdiction under state law
to make the required determinations about the custody and care
of juveniles." Id. at 724. To have such jurisdiction, the
guidance stated that the "evidence submitted must establish that
the court had the power and authority to make the required
determinations about the care and custody of the petitioner,
which includes parental reunification, as a juvenile." Id. To be
able to make the determination that "parental reunification is
no longer viable," the guidance stated the state court "must
have competent jurisdiction to determine whether a parent will
be able to regain custody of the petitioner. Therefore, in order
for a court order to be valid for the purpose of establishing
SIJ eligibility, the court must have competent jurisdiction
. . . to order reunification." Id. (emphasis omitted). The
guidance went on to state that New York State courts lose
capacity to order reunification when juveniles turn eighteen,
and therefore the New York Family Court "necessarily cannot make
a juridical determination that reunification is not viable." Id.
at 725. In short, the guidance spelled out the agency's new
position that if an SIJ petition "does not establish the courts'
jurisdiction under state law to place the child under the
custody of the allegedly unfit parent," the order would not be
considered valid for purposes of establishing SIJ eligibility.
Id.

The agency updated its Consolidated Handbook of
Adjudication Procedures to comport with the February 2018 Legal
Guidance. Id. at 728 (stating that "in order for a court order
to be valid for the purpose of establishing SIJ eligibility, the
court must have the power and authority to determine both
whether a parent could regain custody and to order
reunification, if warranted"). As discussed below, the agency's
new policy, however, is not reflected in its publicly available
Policy Manual.[10]

Although the agency resists using the word "policy" to
refer to its new position,[11] and instead refers to the alleged
policy as a "centralization process" for SIJ adjudications or
merely its "interpretation of the statute," see Transcript of
the February 25, 2019, argument on the motions ("Tr.") at 36,
38-39, the agency's description of its actions is not conclusive

_____

[10] The plaintiffs have included an April 25, 2018, report from
Politico. Malionek Decl. Ex. 13. In that report the USCIS reportedly
commented that it "ha[d] denied roughly 260 applicants who sought
special immigrant juvenile status based on guidance issued in February
[2018]." Id. at 3. The statement specifically cited the February 2018
Legal Guidance as the basis for the denials, explaining that the
denials followed a "clarification by the USCIS chief counsel's office,
which called in February for the agency to reject pending applications
in cases where applicants could not be returned to the custody of a
parent." Id. In addition, "approximately 130 [additional] applicants
were told to expect a denial" based on the February 2018 guidance. Id.
at 4. While the defendants have not denied the accuracy of the report,
given its hearsay nature, the Court will not rely upon it.
[11] At oral argument, the government stated that it "hate[d]" to call
the new policy a policy, and instead, preferred to refer to the policy
as "the agency's interpretation of the statute." Tr. at 38-39.

as to whether there was a policy change, "for it is the substance of what the [agency] has purported to do and has done which is decisive." See Columbia Broad. Sys. v. United States, 316 U.S. 407, 416 (1942). Additionally, the record belies the agency's assertion that there is not a new policy. The USCIS does not dispute the plaintiffs' assertion that the agency regularly approved applications by New York SIJ petitioners above the age of eighteen who had received Special Findings Orders from the New York Family Court before February 2018, and that after that date the agency has virtually stopped approving such applications. See also J.L., 341 F. Supp. 3d at 1063 (finding that the agency sharply departed from past agency practices through its centralization at the National Benefits Center, its February 2018 Legal Guidance, and its updates to its Policy Manual and Consolidated Handbook of Adjudication Procedures which resulted in rejecting Special Findings Orders from California Probate Courts). The agency's fundamental reversal in its practices undermines any assertion that it did not change its policies.

**2.**

Because there is a new agency policy, the operative question with respect to this Court's jurisdiction is whether the policy is a final, reviewable agency action.

42

For the policy to be a "final" and therefore reviewable agency action, it must meet two criteria. First, the policy "must mark the 'consummation' of the agency's decisionmaking process," and second, the policy must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citations omitted). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Franklin v. Mass., 505 U.S. 788, 797 (1992); Salazar v. King, 822 F.3d 61, 82 (2d Cir. 2016).

The defendants assert that the policy is not final under the first Bennett prong because the agency did not follow any formal procedures to enact it.[12] See Dkt. No. 79 at 9. However, the new policy is the result of an internal agency process. The administrative record shows that the agency's Office of Chief Counsel undertook a review process and issued a directive in February 2018 instructing its employees on how to interpret the SIJ statute. The USCIS itself describes the process undertaken to reach this policy in its briefs. According to the USCIS, after SIJ adjudications were centralized in the National

---

[12] The agency's argument that it did not follow procedure strengthens the plaintiffs' argument that the new policy is procedurally defective. See 5 U.S.C. § 706(2)(D) (reviewing courts should set aside agency actions that are "without observation of procedure required by law.").

Benefits Center, the National Benefits Center and the USCIS
Field Office Directorate both requested additional guidance from
the USCIS Office of Chief Counsel regarding cases where a state
court issued a Special Findings Order during guardianship
proceedings for those between eighteen and twenty-one years of
age. The February 2018 Legal Guidance was issued in response to
that request. The agency paused its adjudication of pending
cases that would be affected by the legal guidance. It was only
after the February 2018 Legal Guidance was issued that the
agency began adjudicating these cases again, and it did so in
accordance with the February 2018 guidance. See Dkt. No. 77 at
12.

The policy is also final under the second prong of Bennett.
The February 2018 guidance embodies an agency policy from which
"'rights or obligations have been determined' and from which
'legal consequences will flow.'" Bennett, 520 U.S. at 178
(citations omitted). The policy embodied in the February 2018
Legal Guidance is the source of profound legal consequences for
the plaintiffs because the USCIS relies on it to deny their SIJ
petitions.

The defendants contend that the SIJ status denials (or
pending denials) do not flow from the February 2018 guidance but
rather from the SIJ statute and related regulations. This
argument is simply wrong. The denials and prospective denials of

44

SIJ status are based on the agency's allegedly incorrect interpretation of the SIJ statute based on its new statutory interpretation and not on the statute itself. The stark departure in the agency's evaluation of New York-based SIJ petitions cannot be explained by the agency's assertion that the plaintiffs' denials flowed from the regulations and SIJ statute itself, because neither the regulations nor the statute changed in early 2018. The only change explaining the departure was the new policy set forth in the agency's February 2018 Legal Guidance. It was not until the agency issued the guidance that SIJ status denials for plaintiffs in New York State between the ages of eighteen and twenty-one who had received Special Findings Orders from the New York Family Court became the norm.

Accordingly, both prongs of Bennett are satisfied, and the policy is reviewable under the APA.

## VI.

The plaintiffs and defendants both move for summary judgment on the issues of whether the agency's new policy is arbitrary, capricious, in excess of statutory jurisdiction, and contrary to law, and whether the agency was required to provide public notice of its policy change under 5 U.S.C. § 552(a)(1)(D).

Courts are required to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not

45

in accordance with law." 5 U.S.C. § 706(2)(A). To determine
whether a policy is arbitrary and capricious, courts consider
whether

> the agency has relied on factors which
> Congress has not intended it to consider,
> entirely failed to consider an important
> aspect of the problem, offered an explanation
> for its decision that runs counter to the
> evidence before the agency, or is so
> implausible that it could not be ascribed to
> a difference in view or the product of agency
> expertise.

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.
Ins. Co., 463 U.S. 29, 43 (1983).

### A.

The plaintiffs argue that the agency's new policy violates
the APA because it (1) imposes requirements for a state court to
qualify as a "juvenile court" that go beyond the scope of the
statute, (2) misinterprets New York State law, (3) requires the
agency to act beyond the scope of its consent authority, and (4)
was enacted without adequate notice. The defendants argue that
the agency's positions as expressed in the February 2018 Legal
Guidance are reasonable and in accordance with the law.

The dispute centers on the questions of whether, to qualify
as a juvenile court, the New York Family Court must have (1)
jurisdiction over the custody of the petitioners, and (2) the
authority to order reunification between the juvenile and an
unfit parent. The agency's new policy answers both of these

46

questions in the affirmative. However, as explained below, these requirements go beyond the scope of the SIJ statute and lack a reasoned explanation.

### 1.

The first basis for the agency's conclusion that the New York Family Court is not a "juvenile court" when it exercises jurisdiction over juveniles who are between the ages of eighteen and twenty-one is that, according to the agency, the Family Court lacks jurisdiction to grant custodial rights over juveniles older than eighteen.[13] The agency's implementing regulations define a "juvenile court" as a court "having jurisdiction under State law to make judicial determinations about the custody and care of juveniles." 8 C.F.R. § 204.11(a). Based on this regulation, the agency maintains that to be a juvenile court for purposes of the SIJ statute, the Family Court must have jurisdiction over the individual juvenile's custody. According to the agency, when a state court lacks authority to make custody determinations over an individual juvenile, the state court is not a "juvenile court" under the SIJ statute.

The agency's requirement -- that to be a juvenile court the state court must have jurisdiction to make custody determinations -- is inconsistent with the SIJ statute's plain

---

[13] As explained below, this conclusion is predicated on a misinterpretation of New York State law.

language, which requires that a juvenile be declared dependent on a juvenile court or placed in a qualifying custody arrangement. 8 U.S.C. § 1101(a)(27)(J)(i) (An SIJ is an immigrant "who has been declared dependent on a juvenile court . . . or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual . . . ." (emphasis added)). Congress expressly listed any SIJ prerequisites dealing with custody in the disjunctive, such that a custody order cannot be required in cases where the juvenile has been declared dependent on the juvenile court. The disjunctive nature of the statute is particularly important in this case, because the USCIS concedes that under New York law, a Family Court guardianship order is a dependency order under the SIJ statute. See Dkt. No. 77 at 16 n.6. Accordingly, the plain language of the SIJ statute dictates that the Family Court need not have the authority to make a custody determination in cases where it appoints a guardian. And indeed for each of the named plaintiffs in this case, the Family Court appointed a guardian for the plaintiff and thus the plaintiff satisfied the statute because the plaintiff was dependent on the Family Court.

In making its argument that the Family Court must nevertheless have authority over the juvenile's custody, the agency relies on its implementing regulation found in 8 C.F.R. § 204.11(a). That regulation defines a juvenile court as "a

court located in the United States having jurisdiction under
State law to make judicial determinations about the custody and
care of juveniles." 8 C.F.R. § 204.11(a). But this language is a
relic of the agency's interpretation of the statute when the
statute required that the juvenile be eligible for long-term
foster care as a prerequisite for a finding of SIJ status. That
requirement was removed in 2008, but the regulations were not
changed. Moreover, the agency's interpretation of the term
"juvenile court" is contrary to the plain language of the SIJ
statute. By interpreting the term "juvenile court" to require
that the Family Court have authority to make custody
determinations, the agency imposes a requirement that is
contrary to the plain text of the statute. While agencies have
the authority to construe ambiguous statutes reasonably, they do
not have the authority to change the statute's plain language
chosen by Congress. See Morton v. Ruiz, 415 U.S. 199, 237 (1974)
("In order for an agency interpretation to be granted deference,
it must be consistent with the congressional purpose."). The
agency's definition of "juvenile court" seeks to change the "or"
used by Congress into an "and."[14] The SIJ statute makes a

---

[14] For example, S.W.'s SIJ petition denial states that "Even assuming
you became 'dependent' on the court when the court exercised its
jurisdiction and granted the appointment of a guardian for your
behalf, the INA requires that the custody placement or dependency
declaration be made by a juvenile court, which the regulation defines
as a court with jurisdiction over both the 'custody and care' of the
special immigrant juvenile petitioner." AR 414.

dependency order sufficient. The agency exceeds its authority by also making custody a requirement in addition to dependency.

In any event, the agency's conclusion that Family Courts in New York do not have authority to make custody determinations is based on a misunderstanding of New York State law. New York law grants the Family Court jurisdiction over the custody and care of juveniles up to the age of twenty-one for certain proceedings, including guardianship proceedings, with the consent of the juvenile. See N.Y. Fam. Ct. Act § 661(a); N.Y. Surr. Ct. Proc. Act § 103(27). In New York "there is no substantive difference between the rights and responsibilities of a custodian or guardian of a child." Allen v. Fiedler, 947 N.Y.S.2d 863, 866 (App. Div. 2012) (quotation marks omitted). Under New York law, guardians have both the right and the responsibility to make decisions on the juvenile's behalf, including decisions affecting "the physical custody of the person of the child." N.Y. Fam. Ct. Act § 657(c). Accordingly, the Family Court's appointment of guardians is a "judicial determination[] about the custody and care of juveniles." See 8 C.F.R. § 204.11(a).

### 2.

The agency's second basis for determining that the New York Family Court does not act as a juvenile court when it exercises jurisdiction over juveniles who are older than eighteen is that,

according to the agency, in order to make the finding that
"reunification with 1 or both of the immigrant's parents is not
viable," 8 U.S.C. § 1101(a)(27)(J)(i), the Family Court must
have the power to compel such reunification if warranted by the
circumstances. The February 2018 Legal Guidance specifically
provides that a Special Findings Order from that state court
"will not be considered valid for the purpose of establishing
SIJ eligibility if the evidence submitted by the petitioner does
not establish the courts' jurisdiction under state law to place
the child under the custody of the allegedly unfit parent." AR
725.

     The agency's position -- that in order to make the factual
finding that "reunification with 1 or both of the immigrant's
parents is not viable," 8 U.S.C. § 1101(a)(27)(J)(i), the Family
Court must also have the authority to order reunification with
the allegedly unfit parent -- is contrary to the SIJ statute,
lacks a reasoned explanation, and is based on an erroneous
understanding of New York law.

     To support its position, the Legal Guidance specifically
relied on the regulations that interpreted the statute when it
required that a juvenile be eligible for long-term foster care,
a requirement that was deleted in 2008. See AR 724 (citing 8
C.F.R. § 204.11(a), (d)(2)(i)-(ii)). The requirement that the
Family Court must have authority to order reunification with an

unfit parent cannot be justified by citing the outdated
regulation and there is nothing in the text of the SIJ statute
or any case law to support that requirement. "The TVPRA
expressly removed all references to long-term foster care from
the SIJ statute. The USCIS's reliance on the SIJ regulation's
definition of 'eligible for long-term foster care' holds no
weight when Congress explicitly disapproved of that language."
J.L., 341 F. Supp. 3d at 1059. A regulation may not "amend a
statute, . . . add to the statute something which is not there,"
or, in this case, impose requirements that were expressly
stricken by Congress. See Iglesias v. United States, 848 F.22
362, 266 (2d Cir. 1988) (quotation marks and citations omitted).

Rather than provide reasoning for its conclusion that a
state court must have legal authority to order reunification to
be able to reach the factual conclusion that reunification is
not viable, the agency simply states its position. See, e.g.,
Tr. at 44-48 (government attorney explaining that it
"necessarily follows . . . that the [state] court must have had
the authority to make that determination which affected the
absent parent's rights," without providing legal authority for
that position). The agency's ipse dixit falls short of its
obligation to provide a "satisfactory explanation for its
action[s]." See Motor Vehicle Mfrs. Ass'n of U.S., Inc., 463
U.S. at 43; Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117,

2120 (2016) (Where an agency "fail[s] to provide even a minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law"). The agency's lack of a reasoned explanation for a policy that requires a departure from years of agency practice "results in a rule that cannot carry the force of law."[15] Encino Motorcars, 136 S. Ct. at 2127.

In any event, the USCIS misconstrues New York law when it argues that the Family Court lacks authority to reunify juveniles between the ages of eighteen and twenty-one with their parents. When the Family Court exercises its authority to appoint a guardian for a juvenile, including a juvenile between the ages of eighteen and twenty-one, it may appoint the juvenile's parent to be the juvenile's guardian, in which case the juvenile would be reunified with the juvenile's parent.[16] See

---

[15] In addition to the fact that the agency has not provided a reasoned explanation for this requirement, the requirement makes little sense. The deference that the SIJ statute accords to state-court findings flows not from state courts' power to order reunification but rather from state courts' expertise in making determinations about the best interest of the child. See Perez-Olano v. Gonzalez, 248 F.R.D. 248, 265 (C.D. Cal. 2008) ("The SIJ statute affirms the institutional competence of state courts as the appropriate forum for child welfare determinations regarding abuse, neglect, or abandonment, and a child's best interests."); cf. Ankenbrandt v. Richards, 504 U.S. 689, 702 (1992) (explaining that state courts have jurisdiction over matters affecting domestic relations). It is not apparent why a court must be able to order reunification with an unfit parent in order to make the finding that "reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law." 8 U.S.C. § 1101(a)(27)(J)(i).
[16] Moreover, the Family Court is an expert in making reunification findings. When the Family Court appoints one natural parent over another to be a guardian, or appoints a person other than a parent, the Family Court necessarily evaluates the viability of parental

N.Y. Fam. Ct. Act § 661(a) (providing the Family Court
jurisdiction over guardianship proceedings for juveniles between
the ages of eighteen and twenty-one who consent to the Family
Court's jurisdiction); Matter of Marisol N.H., 979 N.Y.S.2d 643,
646 (App. Div. 2014) (holding that the Family Court has
authority to appoint a natural parent as a guardian). Because the
Family Court has the authority to appoint a natural parent as a
guardian, the Family Court has authority to order the
reunification of a child with the child's natural parent.

### 3.

The plaintiffs also argue that the agency's policy is
arbitrary and capricious because in order to implement the
policy, the agency must act beyond the scope of its consent
authority.

For a child to qualify for SIJ status, the Secretary of DHS
must consent to the grant of SIJ status. 8 U.S.C.
§ 1101(a)(27)(J)(iii). The agency explains that the SIJ
statute's consent authority allows the USCIS to review Special
Findings Orders to ensure that the state court order was "bona
fide," meaning that it "was sought to obtain relief from abuse,
neglect, abandonment, or a similar basis under state law, and

---

reunification. See, e.g., Matter of Marisol N.H., 979 N.Y.S.2d 643,
646 (App. Div. 2014); Matter of Karen C., 973 N.Y.S.2d 810, 811 (App.
Div. 2013); Matter of Trudy-Ann W., 901 N.Y.S.2d at 296.

not primarily or solely to obtain an immigration benefit." AR 709 (USCIS Policy Manual). The USCIS Policy Manual explains that the agency relies on the state court's expertise in these matters, and the agency is not to reweigh the evidence on which the state court relied in issuing a Special Findings Order. Id. at 709-10. The USCIS Ombudsman explains that the agency should not "substitute its application of State law for that of the court's exercise of dependency." Id. at 643.

Relying on Budhathoki v. Nielsen, 898 F.3d 504, 509 (5th Cir. 2018), the defendants argue that its consent authority allows it to examine state court orders to determine whether the state court properly relied on state law in making the predicate findings for SIJ status. Budhathoki is of no help to the defendants. Budhathoki was brought by plaintiffs who had obtained orders from a Texas state court awarding child support after they had turned eighteen years of age. 898 F.3d at 506-07. The state court orders did not purport to be custody or dependency orders. Id. at 512. The Fifth Circuit Court of Appeals held that the USCIS had authority, through its consent function, to determine that the Texas child support orders were not care or custody determinations under the SIJ statute. Id. at 515. There is no contention in this case that the New York Family Court that issues Special Findings Orders only issues child support orders.

Having reviewed the named plaintiffs' Special Findings Orders, the defendants argue that the Family Court relied on the SIJ statute as the basis of its jurisdiction to issue Special Findings Orders, rather than on state law. This argument is belied by the record. The record makes clear that the plaintiffs' Special Findings Orders were based on state law and that under state law the plaintiffs were declared "dependent" on the juvenile court. R.F.M.'s Special Findings Order, for example, states that the Family Court has jurisdiction over R.F.M. until she turns twenty-one under New York Family Court Act § 661(a) and Surrogate Court's Procedure Act §§ 103(27) and 1700 et seq. AR 343-44. R.F.M.'s Special Findings Order also cites New York law for its findings that R.F.M. is dependent on the Family Court, that reunification with her parents is not viable, and that it is not in R.F.M.'s best interest to return to the Dominican Republic. Id. D.A.F.A. and T.D. also obtained Special Findings Orders that cite state law as the basis for the Family Court's jurisdiction. See id. at 72, 595 (Special Findings Orders citing New York law as the basis for the Family Court's jurisdiction). Although S.W.'s Special Findings Order did not list a jurisdictional basis for the order under state law, S.W. responded to the agency's Request for Evidence by attaching evidence that the Family Court issued the Special Findings Order relying on state law. Id. at 465, 470-80, 496,

56

500-506. O.M.S. submitted an amended Special Findings Order that outlined the state law bases for the Family Court's jurisdiction and factual findings. Id. at 808-09.

By arguing that the New York Family Court lacks jurisdiction to make the requisite SIJ findings, the agency is substituting its interpretation of New York law for that of the New York Family Court. The defendants have not cited any authority to support such a broad use of the consent function. Indeed, such a broad use of the consent function contravenes the directives in the agency's Consolidated Handbook of Adjudication Procedures, which instructs that the USCIS "should defer to the juvenile court's interpretation of the relevant state laws" and, accordingly, "a petition should not be denied based on USCIS' interpretation of the relevant state laws." Id. at 728; cf. J.L., 341 F. Supp. 3d at 1061 n.6 (explaining that even if "the statute's consent requirement requires it to review SIJ petitions to determine whether the juvenile court order is bona fide, . . . whether a juvenile court order is bona fide has no bearing on whether the issuing court had jurisdiction").

**4.**

The plaintiffs also argue that the agency's policy is procedurally defective because the agency failed to provide adequate notice under § 706 of the APA, which requires courts to hold unlawful and set aside agency action, findings, and

57

conclusions found to be "without observance of procedure
required by law." 5 U.S.C. § 706(2)(D). The plaintiffs allege
that the agency's new policy failed to comply with § 3 of the
APA, as amended by the Freedom of Information Act, 5 U.S.C.
§ 552, which requires that "[e]ach agency shall separately state
and currently publish in the Federal Register for the guidance
of the public-- . . . (D) substantive rules of general
applicability adopted as authorized by law, and statements of
general policy or interpretations of general applicability
formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D).
The defendants argue that notice was given because the USCIS
Policy Manual is available to the public.[17]

The agency's new policy is binding in SIJ adjudications and
therefore "readily falls within the broad category of rules and
interpretations encompassed by § 552(a)(1)(D)." Snyder v. Sec'y
of Veterans Affairs, 858 F.3d 1410, 1413 (Fed. Cir. 2017). The
agency's policy "narrowly limits agency discretion" and
"establishes a binding norm" that "effectively replaced agency
discretion with a new binding rule of substantial law." J.L.,

---

[17] The defendants also argue that notice was not required because there
is no new policy. However, as explained above, the positions taken in
the February 2018 Legal Guidance constitute a new agency policy.
Moreover, the agency's position that it did not enact a new policy
supports the plaintiffs' argument that the policy is arbitrary and
capricious because when enacting a policy, "the agency must at least
'display awareness that it is changing position.'" Encino Motorcars,
136 S. Ct. at 2126 (quoting F.C.C. v. Fox Television Stations, Inc.,
556 U.S. 502, 525 (2009)).

341 F. Supp. at 1065 (quotation marks omitted). Indeed, the agency has demonstrated the binding nature of the policy by consistently denying SIJ applications to petitioners over the age of eighteen in New York on the basis of the new policy. Accordingly, the USCIS was required to provide notice of its new policy under 5 U.S.C. § 552.

The agency argues that it complied with the APA's notice requirements because its Policy Manual, which is available to the public, explains its position. However, the USCIS's narrow interpretation of the New York Family Court's jurisdiction to issue Special Findings Orders for petitioners over the age of eighteen -- which was the dispositive factor in the denial of each named plaintiff's SIJ petition -- cannot be found in the Policy Manual. At oral argument, the defendants stated that Section J.D.2 of its Policy Manual explains its policy. See Tr. at 54. That section, however, merely states that

> [t]he juvenile court must find that reunification with one or both parents is not viable due to abuse, neglect, abandonment, or a similar basis under the relevant state child welfare laws. Lack of viable reunification generally means that the court intends its finding that the child cannot reunify with his or her parent (or parents) remains in effect until the child ages out of the juvenile court's jurisdiction. The temporary unavailability of a child's parent does not meet the eligibility requirement that family reunification is not viable. However, actual termination of parental rights is not required.

59

> The findings must be based upon the person (or
> persons) who is the petitioner's parent (or
> parents) under state law. If the juvenile
> court order establishes that the person (or
> persons) is the petitioner's parent (or
> parents), USCIS generally considers this
> requirement met. However, if the record does
> not establish that the person (or persons) is
> the petitioner's parent (or parents), USCIS
> may request additional evidence.

AR 708. Other portions of the Policy Manual provide that state
courts must follow their own laws regarding their jurisdiction
and that Special Findings Orders should establish that the
findings made by the state court were made under state law. Id.
at 708, 714, 717.

The Policy Manual contains no statement that the state
court must have jurisdiction over the petitioner's custody, even
in cases where the petitioner is declared dependent on the
juvenile court. Nor does the Policy Manual explain the agency's
position that in order to find that reunification with one or
more parents is not viable, the state court must have the
authority to order reunification with an unfit parent. It is
only in the February 2018 Legal Guidance that the agency
explains its policy, stating that

> [w]here a court loses the capacity to order
> reunification with a parent at age 18, they
> necessarily cannot make a juridical
> determination that reunification is not
> viable. Accordingly, a state court order
> finding that parental reunification is not
> viable will not be considered valid for the

> purpose of establishing SIJ eligibility if the
> evidence submitted by the petitioner does not
> establish the courts' jurisdiction under state
> law to place the child under the custody of
> the allegedly unfit parent.

Id. at 725. The February 2018 Legal Guidance was not publicly

available, and therefore could not have satisfied APA notice

requirements. An agency may not "depart from a prior policy sub

silentio." F.C.C. v. Fox Television Stations, Inc., 556 U.S.

502, 515 (2009); Encino, 136 S. Ct. at 2120 ("An unexplained

inconsistency in agency policy is a reason for holding an

interpretation to be an arbitrary and capricious change from

agency practice." (quotation marks omitted)). Accordingly, the

USCIS did not provide adequate notice of its new policy.

Because the agency's policy is contrary to the plain

language of the SIJ statute, lacks a reasoned explanation, is

premised on erroneous interpretations of state law, and was not

enacted with adequate notice, the policy is arbitrary and

capricious, "in excess of statutory jurisdiction," and "without

observance of procedure required by law." See 5 U.S.C.

§ 706(2)(A), (C)-(D). Accordingly, the policy must be set aside.

Id.

## CONCLUSION

The Court has considered all of the arguments of the

parties. To the extent not specifically addressed, the arguments

are either moot or without merit. For the reasons explained

above, the agency's new policy is in violation of the APA. The plaintiffs' motions for class certification, to proceed anonymously, and for summary judgment are **granted**. The defendants' motions to dismiss and for summary judgment are **denied**. The Clerk of Court is directed to close Docket Numbers 7, 9, 12, 64, 78, and 92.

The plaintiffs are directed to submit a proposed judgment with declaratory and injunctive relief and a supporting brief by **March 22, 2019**. The defendants may respond by **March 29, 2019**.

**SO ORDERED.**

Dated:     New York, New York
           March 15, 2019

                                    John G. Koeltl
                            United States District Judge